ISHEE, J.,
 

 for the Court:
 

 ¶ 1. On or about July 28, 2006, Sherman Sanders (Sherman) instigated a physical altercation with his wife, Edna Mae Sanders (Sanders), that ultimately resulted in Sherman’s death. In January 2007, Sanders was charged with murder. Following a two-day trial held in Hancock County Circuit Court in April 2008, Sanders was convicted of murder and sentenced to life in prison in the custody of the Mississippi Department of Corrections (MDOC). She appeals, arguing that the trial court erred by allowing hearsay statements made by Sherman into evidence, by declining to instruct the jury that she was not under a duty to retreat from an assault made on her in her home, and by declining to admit evidence in support of her theory of self-defense and defense of others. We find that the trial court erred by failing to instruct the jury that Sanders was not required to retreat and by excluding evidence in support of her theory of self-defense and defense of others. Therefore, we reverse and remand.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶ 2. In July 2006, Sherman began a physical confrontation with Sanders in their home in Diamondhead, Mississippi, where the couple lived with Sanders’s two children. While the circumstances leading up to the confrontation were disputed, it is certain that Sanders poured a pot of hot cooking oil on Sherman, causing instantaneous severe injuries and, eventually, Sherman’s death.
 

 ¶ 3. When emergency responders arrived to assist Sherman, they found him alive and conscious. Before being taken to the hospital, Sherman made several statements to emergency responders regarding the incident in question, and, in doing so, implied that his wife had poured hot oil on him. Some time later, Sherman died in the hospital from his burn injuries.
 

 ¶ 4. Thereafter, Sanders was charged with murder. The trial was held before Judge Stephen B. Simpson. At the trial, counsel for the defense proceeded on a theory of self-defense and defense of others, as Sanders asserted that Sherman’s death was the result of her protecting the lives of herself and her children. In support of Sanders’s claim that she had a reasonable apprehension that she and her children were in imminent danger from Sherman, her counsel attempted to present testimony which would prove Sherman’s violent nature toward her and her children. However, the trial court excluded most of the testimony regarding Sherman’s violent character. Specifically, Sanders was prevented from discussing her discovery of Sherman raping her then thirteen-year-old daughter on the night of the incident and threats made by Sherman on her life. Likewise, Sanders’s daughter was prohibited from testifying as to the violent sexual assault made on her by Sherman, which was the immediate pre
 
 *500
 
 cursor to Sherman’s physical attack on Sanders.
 

 ¶ 5. Additionally, Sanders testified that she was aware Sherman possessed a gun. Although Sanders’s counsel attempted to question her regarding her knowledge that Sherman kept the gun hidden under the mattress in their bedroom, the trial court sustained an objection to the testimony on the ground that the information was irrelevant. However, Sanders was allowed to testify that toward the end of the altercation, Sherman let go of her and headed toward their bedroom in the back of the house. She attempted to testify as to a threat made by Sherman against her life upon his letting her go and walking to the bedroom, but she was again stopped by the court. Sanders then stated that she followed Sherman to the bedroom in fear of her life and the lives of her children and on the way, she reached for the nearest weapon she could find — a pot of hot oil that she had heated on the stove to cook a late-night snack. Upon reaching the bedroom, Sanders testified that she found Sherman reaching for his gun and then turning to her with it. It was then that she tossed the pot of oil on him and fled from the house with her children.
 

 ¶ 6. During cross-examination of Sanders, the prosecution made pointed references to Sanders’s location in the house before Sherman let her go and started toward the bedroom. The prosecution noted several exit doors in the home and asked Sanders to state her accessibility to the exit doors during the attack. In sum, the prosecution presented the jury with the possibility that Sanders was able to have escaped through an exit door in the house prior to Sherman threatening her with the gun and her tossing the hot oil on him.
 

 ¶ 7. At the close of the trial, Sanders’s counsel asked that jury instruction D-9 be included in the final list of jury instructions. D-9 outlined Mississippi statutory law providing that as long as Sanders was not the initial aggressor, was not engaged in unlawful activity, was in a place where she had a right to be, and was acting in defense of herself or others due to imminent danger, then she had no duty to retreat before using deadly force. However, the trial court denied the use of D-9 in the final jury instructions. The trial court did not allow any jury instruction informing the jurors that Sanders had no duty to retreat from her home during the attack.
 

 ¶ 8. Sanders was found guilty of murder and sentenced to life. Thereafter, Judge Simpson stepped down from the bench and was replaced by Judge Lawrence Paul Bourgeouis Jr. Sanders’s counsel filed a motion for a judgment notwithstanding the verdict (JNOV), which was denied by Judge Bourgeouis. Aggrieved, Sanders appeals. We reverse and remand for further proceedings consistent with our findings.
 

 DISCUSSION
 

 I. Admission of Sherman’s Statements
 

 ¶ 9. Sanders first challenges the trial court’s use of the hearsay exceptions “present sense impression” and “excited utterance” to admit hearsay statements made by Sherman to emergency responders. It is well settled that this Court reviews a trial court’s ruling on admissibility of evidence using an abuse-of-discretion standard of review.
 
 Peterson v. State,
 
 37 So.3d 669, 673 (¶ 15) (Miss.Ct.App.2010) (citing
 
 Edwards v. State,
 
 856 So.2d 587, 592 (¶ 12) (Miss.Ct.App.2003)).
 

 ¶ 10. The hearsay exception of present sense impression is found in Mississippi Rule of Evidence 803(1) and allows for out-of-court statements to be deemed admissible in court if the statements are “describ
 
 *501
 
 ing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter.” M.R.E. 803(1). This exception is “based on the theory that the con-temporaneousness of the occurrence of the event and the statement render it unlikely that the declarant made a deliberate or conscious misrepresentation.”
 
 Clark v.
 
 State, 693 So.2d 927, 932 (Miss.1997).
 

 ¶ 11. The record indicates that after Sanders threw the hot oil on Sherman and fled from the premises, Sherman gained the attention of neighbors by honking his car horn and asking for help. Shortly thereafter, emergency responders arrived at the scene of the incident and asked Sherman a series of questions in order to determine the proper measures to investigate the crime and in order to treat his severe burn injuries. An officer with the Hancock County Sheriffs Office was one of the first responders at the scene. The officer testified that he immediately asked Sherman, “what happened.” The officer stated Sherman said, “his wife poured oil on him, or burned him rather.”
 

 ¶ 12. Sanders asserts that Sherman’s statements were made in response to an inquiry from the officer and not spontaneously. Sanders argues that all testimony from emergency responders should be barred as the responders elicited Sherman’s response as opposed to Sherman speaking without a prompt. Sanders further claims that too much time had passed between Sherman receiving the burn injuries and the emergency responders arriving on the scene for Sherman’s statements to be considered a “present sense impression” under Rule 803(1).
 

 ¶ 13. The record reflects that emergency responders arrived shortly after the incident had occurred and found Sherman alive and conscious. In speaking with him to determine criminal investigatory needs and medical diagnoses, the responders stated that Sherman’s voice was “shaky,” but understandable. While the responders did ask Sherman basic preliminary questions in order to provide proper medical care and help for Sherman, we find that it is feasible to interpret Sherman’s statements as spontaneous descriptions of what had just occurred. After receiving such severe burn injuries, it is indisputable that Sherman was in an excited condition, possibly shock, for some time after his injuries were inflicted. Accordingly, while simple questions may have been asked as to Sherman’s condition, it is legitimate to perceive Sherman’s response that his wife had burned him as Sherman’s general present sense impression of what was happening to him and not necessarily specific answers to the responders’ questions. It is reasonable to conclude that Sherman was in such a state of shock when speaking to responders that his statements were more likely the product of him reflecting on the circumstances than answering specific questions.
 

 ¶ 14. After reviewing the evidence, the trial judge opined that in considering “the consistency of the statements and the time in which they were made in conjunction with the time that [Sherman] clearly started seeking help ... he was in a sufficient excited condition and reaction to the event or condition that caused his injuries such as to make these statements reliable.” The trial judge further held that Sherman’s statement, “although while not perceiving the event ... were sufficiently immediately thereafter or close in time and proximity to be admissible.” We cannot find that the trial judge abused his discretion by applying the present-sense-impression exception to Sherman’s hearsay statements.
 

 ¶ 15. Nonetheless, even if the hearsay statements did not fall within the
 
 *502
 
 present-sense-impression exception, the trial judge further admitted them under the excited-utterance exception. The excited-utterance exception to hearsay is found under Mississippi Rule of Evidence 803(2) and allows for statements, “relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.” M.R.E. 803(2).
 

 ¶ 16. It has been established by the record that the statements in question were obtained by emergency responders who arrived at the scene shortly after Sherman had suffered his injuries. It is reasonable to determine that at the time Sherman spoke with responders, he was still under extreme stress caused by his severe burn wounds.
 

 ¶ 17. Here too, Sanders argues that the statements made by Sherman were not spontaneous enough to fall within the excited-utterance exception because they were preceded by questions from responders as to Sherman’s condition. However, this Court has held that “where the excited utterance is prompted by a simple question, even from an officer, such as ‘What happened?’ or ‘What’s wrong?’ it may still fall under the exception.”
 
 Eubanks v. State,
 
 28 So.3d 607, 611 (¶ 18) (Miss.Ct. App.2009) (quoting
 
 Carter v. State,
 
 722 So.2d 1258, 1261 (¶ 10) (Miss.1998)). Specifically, the Mississippi Supreme Court has held that the simple question of “What happened?” is “an example of a question that, while bearing upon the spontaneity requirement, does not necessarily preclude admission of the statement as an excited utterance.”
 
 Carter,
 
 722 So.2d at 1261 (¶ 10).
 

 ¶ 18. Accordingly, we cannot find that the trial judge abused his discretion in admitting Sherman’s statements under either the present-sense-impression exception or the excited-utterance exception to hearsay. This issue is without merit.
 

 II. Failure to Grant a Jury Instruction Negating a Duty to Retreat
 

 ¶ 19. Sanders next asserts that the trial court erred by failing to provide the jury with an instruction that she was not under a duty to retreat from an assault made on her in her home. “It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the denial of jury instructions is abuse of discretion.”
 
 Newell v. State,
 
 49 So.3d 66, 73 (¶ 20) (Miss.2010). Furthermore, “the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found.”
 
 Id.
 
 (quoting
 
 Rubenstein v. State,
 
 941 So.2d 735, 785 (¶224) (Miss.2006)). Nonetheless, the Mississippi Supreme Court has held that “a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court.”
 
 Giles v. State,
 
 650 So.2d 846, 849 (Miss.1995).
 

 ¶ 20. Jury instruction D-9 states the following:
 

 The court instructs the Jury that while the danger which will justify the taking of another’s life must be imminent, impending and present, such danger need not be unavoidable except by killing in self-defense. The Defendant, Edna Mae Sanders, need not have avoided the danger to her person presented by the victim by flight. So long as the Defendant was in a place where she had the right to be and was neither the immediate provoker nor aggressor, she may stand her ground without losing the right of self-defense.
 

 
 *503
 
 Sanders asserts that the trial court, by declining to include this instruction, committed manifest error because failure to inform the jury of this pertinent law undermined her claim of self-defense.
 

 ¶ 21. The pertinent law in question was codified in Mississippi in 2006 and is commonly referred to as the “Castle Doctrine.” Miss.Code Ann. § 97-3-15(3), (4) (Rev.2006). The Castle Doctrine reads, in pertinent part, as follows:
 

 (3) A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another ... and the person who used defensive force knew or had reason to believe that the ... unlawful and forcible act was occurring or had occurred.
 

 (4) A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force ... if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person’s failure to retreat as evidence that the person’s use of force was unnecessary, excessive or unreasonable.
 

 Id.
 

 ¶ 22. Here, the record reflects that Sanders was not the initial aggressor. Both Sanders and her daughter testified that Sherman attacked Sanders first and without provocation. The record also shows that Sanders was not engaged in unlawful activity and, clearly, had a right to be in her own home. Additionally, the record reflects that Sanders feared great bodily harm and imminent death to herself and her children at the hands of Sherman. Not only did Sherman violently attack Sanders’s daughter and threaten Sanders’s life on numerous occasions, he drew his gun and pointed it directly at her immediately after telling her he would kill her. Accordingly, the Castle Doctrine is applicable to Sanders and directly relates to her self-defense theory.
 

 ¶ 23. At trial, the prosecution repeatedly attempted to elicit testimony from Sanders on cross-examination regarding her ability to exit the home during the attack. On at least one occasion, the prosecution blatantly said to Sanders: “There’s a door right there, a front door right there ... you could have went [sic] out that door, correct?” As such, the jury was completely unaware that Sanders did not have a duty to retreat from her home, but instead, she had the right to remain in her home and defend herself and her children to whatever degree necessary to avoid the great bodily harm and imminent death that Sanders testified she feared from Sherman. Furthermore, due to the prosecution’s pointed statements regarding Sanders’s ability to retreat, the jury was, in fact, directed to note that Sanders may have been able to escape through an exit door of the home.
 

 ¶ 24. Without being informed of the rights Sanders possessed under the Castle Doctrine, either through jury instruction D-9 or another informative instruction, the jury was improperly allowed to consider Sanders’s failure to retreat as evidence that her use of force was unnecessary, excessive, or unreasonable. We find that the trial judge’s refusal to grant a jury instruction regarding the Castle Doctrine constituted reversible error.
 

 III. Exclusion of Evidence Supporting Sanders’s Defense
 

 ¶ 25. Finally, Sanders argues that the trial court committed manifest error by excluding testimony from defense witnesses that directly related to her self-defense theory. As stated previously, this Court reviews a trial court’s ruling on
 
 *504
 
 admissibility of evidence using an abuse-of-discretion standard of review.
 
 Peterson,
 
 37 So.3d at 673 (¶ 15) (internal citation omitted). “Unless [a trial] judge abuses this discretion so as to be prejudicial to the accused, the Court will not reverse this ruling.”
 
 Robinson v. State,
 
 940 So.2d 235, 238 (¶ 7) (Miss.2006). With regard to testimony, generally, “when a party objects to the exclusion of evidence, he must make an offer of proof ... on the record for the benefit of the appellate court.” M.R.E. 103(a)(2) cmt. However, the Mississippi Supreme Court has also recognized that Mississippi Rule of Evidence 103(a)(2) provides an alternative to making a formal proffer of evidence and allows for appellate review of evidence that “was apparent from the context” of the testimony and questions asked.
 
 Heidel v. State,
 
 587 So.2d 835, 844 (Miss.1991).
 

 ¶ 26. Sanders’s theory of the case rest-, ed upon self-defense and defense of her children. The applicable statute for self-defense reads, in pertinent part, as follows:
 

 The killing of a human being by the act, procurement or omission of another shall be justifiable ... [w]hen committed in the lawful defense of one’s own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished.
 

 Miss.Code Ann. § 97 — 3—15(l)(f) (Rev.2006). Accordingly, Sanders’s counsel attempted to present testimony to further Sanders’s assertion that she reasonably apprehended imminent great personal injury or a felonious act committed by Sherman on herself and her children.
 

 A. Sexual Assault of Sanders’s Daughter
 

 ¶ 27. Prior to the trial, Sanders’s counsel filed a motion for an overt-act hearing regarding Sherman’s violent nature and submitted testimony from Sanders’s daughter, K.K.,
 
 [1]
 
 with the motion. K.K. was thirteen years old at the time of the incident. Her testimony reflected that on the night in question, her mother left the home in order to run an errand and that she was in the house with her brother and Sherman. She said that she went to bed and later awoke to Sherman, with his pants off, on top of her pulling her clothes off. She further stated the following:
 

 I was pushing him off of me[,] trying to push him off of me[,] but he was just so heavy I couldn’t move him. I was telling him to get off of me[,] screamingf,] and I hit the wall ... and ... my mom comes into the room and you know she opens the door and Mr. Sherman gets up and pulls up his pants and he immediately walks to her and punches her and she falls to the floor and when she falls ... he punches and knocks her into the hallway.
 

 Later in her testimony, when asked whether Sherman had raped her during the incident described above, K.K. stated that he had.
 

 ¶ 28. At trial, Sanders’s counsel attempted to introduce testimony from K.K. reflecting the violent, felonious attack upon her by Sherman. Sanders’s counsel further attempted to allow Sanders to testify as to hearing K.K. screaming, “Stop it, leave me alone,” and to entering K.K.’s room to find Sherman attacking her daughter. K.K’s testimony and Sanders’s testimony were meant to support her claim of self-defense and defense of others, as it would help to establish Sanders’s
 
 *505
 
 “reasonable ground to apprehend a design to commit a felony, or to do some great personal injury” to Sanders and her daughter. Miss.Code Ann. § 97-3-15(l)(f). However, the trial judge prohibited all testimony regarding the sexual assault. The trial court held that while K.K. could testify as to seeing Sherman attack her mother, since it established that Sanders was not the initial aggressor, K.K’s testimony regarding the rape was irrelevant. Likewise, the trial court determined that Sanders’s testimony as to seeing Sherman attacking her daughter upon entering her daughter’s room was irrelevant.
 

 ¶ 29. We disagree. While Sanders’s counsel only discussed this error in passing in the appellate brief submitted to this Court, we address the issue under the plain-error-doctrine which allows for our analysis of plain errors that were not properly raised by the defendant. M.R.E. 108(d). This Court may review plain error which “seriously affects the fairness, integrity or public reputation of judicial proceedings.”
 
 United States v. Olano,
 
 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (citations omitted). “Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law.”
 
 Smith v. State,
 
 986 So.2d 290, 294 (¶ 10) (Miss.2008) (quoting
 
 Newport v. Fact Concerts,
 
 453 U.S. 247, 256, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)).
 

 ¶ 30. Mississippi Rules of Evidence 404 and 405 govern admissibility of testimony regarding a person’s character. Rule 404(a)(2) provides that evidence of a character trait of a person is not admissible except in circumstances including where “[ejvidence of a pertinent trait of character of the victim of the crime [is] offered by an accused.” Rule 405(b) then permits the following: “In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.” A victim’s character trait of violence is made an essential element of a charge when an accused claims self-defense and defense of others.
 
 Heidel,
 
 587 So.2d at 845. Furthermore, Rule 404(b) states that evidence of “other crimes, wrongs, or acts ... may ... be admissible [to show proof of] motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.”
 

 ¶ 31. Accordingly, Rule 404(a)(2) provided Sanders with the requisite authority to introduce evidence of Sherman’s violent character. Rule 405(b) further allowed her to introduce evidence of specific instances of Sherman’s violence toward her and her children, given her claim of self-defense and defense of her children. These rules alone make K.K.’s testimony as to Sherman’s rape of her and Sanders’s testimony as to her sudden discovery of the rape both relevant and admissible.
 

 ¶ 32. Evidence regarding the sexual assault was also admissible under Rule 404(b) in order to prove Sherman’s intent and plan to harm Sanders and her children. K.K.’s testimony alone clearly explained the crucial incident that gave rise to Sanders’s reasonable apprehension of great harm to K.K. As such, evidence of Sherman’s rape of K.K. directly related to Sanders’s claim of self-defense and defense of others. Therefore, exclusion of K.K.’s testimony as to Sherman’s sexual assault of her and Sanders’s testimony as to Sherman attacking her daughter constituted reversible error.
 

 B. Sherman’s Threats
 

 ¶ 33. At trial, Sanders took the stand in her own defense. During direct examination, her counsel asked her if Sherman had ever threatened her. Sanders responded that he had threatened her many times. Upon being asked to de
 
 *506
 
 scribe some of the threats she had received from Sherman, she stated that he had threatened to “make [her] disappear.” The prosecution objected to her testimony on the ground of hearsay. The objection was sustained.
 

 ¶ 34. Later, Sanders’s counsel asked her to describe in detail a portion of Sherman’s attack on her. She stated the following: “at one point Sherman had me on the back of the sofa, I’m on this side of it, and had me choking me, telling me.... ” Sanders, however, had been previously warned by the trial court that she was not allowed to testify as to anything Sherman had said to her, including threats he had made against her. Accordingly, Sanders stopped her testimony mid-sentence.
 

 ¶ 35. Sanders was periodically prevented from fully testifying throughout her time on the witness stand, as evidenced by the following:
 

 Q. Did you say, I’m going to the police?
 

 A. Yes, I did.
 

 Q. Did he do anything when you started saying, “I’m going to the police”? What did he do?
 

 A. What did he do, not what he said?
 

 Q. Not what he said. What did he do?
 

 A. Oh. By that time he headed back [toward the bedroom]. And I can’t say what he told me?
 

 THE COURT: No ma’am.
 

 Q. What did you at that time think he was going to do?
 

 A. He told me what he was going to do.
 

 Q. You can’t say it.
 

 A. I thought he was going back there to get a gun and shoot me.
 

 A. Could I say I was told I was going to be done harm?
 

 Q. You can’t say what anybody else said. Did you think that your life was in danger?
 

 A. Yes.
 

 Q. Or the lives of your children?
 

 A. Yes.
 

 Q. Do you remember at some point breaking away from him?
 

 A. Oh, he let me go.
 

 Q. How did he let you go?
 

 A. It wasn’t a break away. He let me go.
 

 Q. How did he let you go?
 

 A. He just let go of me and said what he was going to do.
 

 Q. You can’t say it.
 

 A. Oh, okay.
 

 ¶ 36. Additionally, earlier in Sanders’s testimony she was asked by her counsel if she had ever seen Sherman with a gun while they were living in Diamondhead, Mississippi. She began to answer affirmatively, but she was stopped by a sustained objection to relevancy. Likewise, when her counsel asked if she knew where Sherman had hidden his gun, she began to answer that she did, but she was halted by another sustained objection to relevancy.
 

 ¶ 37. When a criminal defendant relies on a theory of self-defense and defense of others, he or she is “of right entitled to offer evidence that [the victim] had previously and recently threatened [the defendant].... This evidence [is] relevant on the issue of [the defendant’s] state of mind.”
 
 Heidel,
 
 587 So.2d at 844-45. Sherman’s threats to kill Sanders are certainly relevant under Mississippi Rule of Evidence 404(b) in order to show Sherman’s intent and plan to kill Sanders. Furthermore, as noted by the Mississippi Supreme Court in
 
 Heidel
 
 and pursuant to Mississippi Rule of Evidence 803(3), Sherman’s statements become admissible hear
 
 *507
 
 say statements as they fall within Rule 803(3), which allows “[a] statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health).”
 

 ¶ 38. It is apparent from the context of the testimony that Sherman had threatened Sanders’s life prior to this occasion and that he was threatening her life during the incident. It is also clear that Sanders knew Sherman possessed a gun that was hidden in their bedroom. Furthermore, Sanders’s testimony makes it apparent that upon letting her go, Sherman threatened to kill her and subsequently headed toward the bedroom where he ultimately retrieved his gun and began pointing it at her. The suppression of this evidence prevented the jury from fully understanding Sherman’s state of mind and intention to kill Sanders, Sanders’s state of mind during the attack, and the grounds for her reasonable apprehension that she and her children were in serious imminent danger. Accordingly, we hold that the trial court’s exclusion of this evidence constitutes reversible error.
 

 CONCLUSION
 

 ¶ 39. We find that the trial court’s decision to allow into evidence Sherman’s statements made to emergency responders was not error. However, we find reversible error in the trial court’s exclusion of a jury instruction informing the jury that Sanders did not have a duty to retreat during the attack. We also find reversible error in the trial court’s suppression of evidence regarding Sherman’s sexual assault of K.K. and evidence regarding Sherman’s threats on Sanders’s life and evidence regarding Sanders’s knowledge of Sherman’s gun, including the location in their house where Sherman had hidden the gun. Therefore, we reverse the conviction and sentence and remand this case for further proceedings consistent with this opinion.
 

 ¶ 40. THE JUDGMENT OF THE HANCOCK COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HANCOCK COUNTY.
 

 LEE, C.J., GRIFFIS, P.J., MYERS, BARNES, ROBERTS AND CARLTON, JJ., CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT. IRVING, P.J., CONCURS IN RESULT ONLY.
 

 [1]
 

 . The Court of Appeals declines to identify sexual assault victims. In the interest of the child's privacy, the minor's name has been substituted with initials.