ON WRIT OF CERTIORARI

LAMAR, Justice,
for the Court:
¶ 1. A Hancock County jury convicted Edna Mae Sanders of murdering her husband, Sherman Sanders, and the judge sentenced her to life in prison. The Court of Appeals reversed her conviction and remanded for a new trial based on the trial court’s error in denying a “no duty to retreat” instruction, and its error in suppressing evidence. Sanders v. State, 77 So.3d 497, 506-07 (Miss.Ct.App. 2011). We granted the State’s petition for writ of certiorari. After full review, we agree with the Court of Appeals’ ultimate disposition. We write to address Sanders’s Confrontation Clause argument and to clarify the Court of Appeals’ discussion of the “Castle Doctrine.”
FACTS AND PROCEDURAL HISTORY
¶ 2. We limit our recitation of the facts to those relevant to the issues we discuss. In July 2006, Sherman Sanders was severely burned with cooking oil, resulting in his death several days later. While the cause of death is undisputed, the circumstances leading up to the incident are not. The State theorized that Edna Mae Sanders threw a pot of hot cooking oil on Sherman while he was sleeping in their bed, as Sherman made several statements to that effect to the first responders. But Sanders testified that she threw the oil to protect herself and her children after Sherman had violently attacked her.
¶ 3. Before trial, Sanders filed a motion in limine, asking the trial court to exclude Sherman’s incriminating statements to the first responders, but the trial court denied the motion after a hearing. At trial, the State called Deputy Brandon Hendry to testify. Hendry testified that he was dispatched on a 911 call from a neighbor who reported “hearing a subject yelling for help and blowing a horn” in the yard. He was the first on the scene, and as he approached Sherman, he asked “what happened?” Hendry testified that Sherman responded that “he was asleep and he don’t [sic] know why his wife poured burning oil on him.” The State also called Emergency Medical Technician (EMT) Lieutenant Michael Munger to testify. Munger also was dispatched to the Sanders’s residence the evening of the incident. Upon his arrival, Munger testified that he had asked Sherman what happened, and *486 Sherman had responded that “he was sleeping and he woke up to his wife pouring oil on him.”
¶ 4. Sanders took the stand in her own defense and testified that Sherman had begun a violent physical altercation with her that evening. She testified that he had punched her and dragged her down the hallway, and that he had leaned her across the couch and had choked her. She screamed for her daughter and son to get out of the house. She testified that she had thought her life and her children’s lives were in danger. At some point, Sherman released her and told her “what he was going to do.”[1] Sanders testified that she had thought “this man is going to, he’s going to kill me,” so she had grabbed the pot of oil off the stove and had followed him down the hallway to their bedroom. Sanders said when she had seen Sherman pull “the mattress back and [come] around with that gun,” she had tossed the grease on him and ran.
¶ 5. At the conclusion of the evidence, Sanders requested a “no duty to retreat” instruction — an instruction that would inform the jury that she was under no duty to retreat from an assault against her in her own home. But the trial judge refused the instruction, stating that he thought it was “inconsistent with the evidence.” The jury found Sanders guilty of murder, and the trial judge sentenced her to life in prison.
¶ 6. Sanders appealed, arguing that the trial judge erred when he (1) allowed the first responders to relay Sherman’s incriminating statements; (2) refused to instruct the jury that she had no duty to retreat; and (3) declined to admit evidence of her state of mind that would support her theory of self-defense. The Court of Appeals agreed with the trial judge that Sherman’s statements were properly admitted under exceptions to the hearsay rule, but failed to address Sanders’s claim that the statements violated her right to confront witnesses. The Court of Appeals found error and remanded for a new trial.
¶ 7. The State filed a motion for writ of certiorari, which we granted. The State argues that the Court of Appeals erred when it (1) found that Sanders was entitled to a “no duty to retreat” instruction, because the evidence showed that she reinitiated the attack after Sherman had released her; (2) incorrectly conflated Mississippi Code Section 97-3-15(3) and (4), and in doing so, “created precedent” for defendants to claim entitlement to the presumption of reasonable fear, even where the person “against whom ‘defensive force’ was used was a resident of the dwelling”; and (3) improperly invoked plain error to review the exclusion of testimony regarding Sherman’s alleged sexual molestation of Sanders’s daughter.
¶ 8. As mentioned above, we agree with the Court of Appeals’ ultimate disposition. But we address the State’s argument that the Court of Appeals incorrectly implied that Sanders was entitled to a presumption that her fear was reasonable. And we also address Sanders’s argument that her right to confront the witnesses against her was violated by the admission of Sherman’s statements to the first responders. We find no merit in the State’s remaining claims on certiorari.
ANALYSIS
A. Presumption of Reasonable Fear
¶ 9. We agree with the Court of Appeals that the trial judge erred when he denied Sanders’s requested “no duty to *487 retreat”[2] instruction. But in its discussion of that issue, the Court of Appeals quoted from subsection (8) of Mississippi Code Section 97-3-15, which clearly does not apply in this case. Subsection (8) establishes a presumption of reasonable fear in certain instances of self-defense and states that:
A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling ... if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling ... or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person’s will from that dwelling ... or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred.
Miss.Code Ann. § 97-3-15(3) (Rev.2006) (emphasis added).
¶ 10. But subsection (3), read in its entirety, clearly establishes that the presumption of reasonable fear does not apply when the person against whom defensive force was used was lawfully present:
This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof....
Id. (emphasis added). We agree with the State that the Court of Appeals’ inclusion of subsection (3) in its analysis could create confusion, and we therefore clarify that a defendant may not claim the presumption of reasonable fear when the person against whom defensive force was used had a right to be in or was a lawful resident or owner of the dwelling.
B. Confrontation Clause
¶ 11. Sanders argued before the Court of Appeals that the admission of Sherman’s incriminating statements to the first responders violated her Sixth Amendment right to confront the witnesses against her. The Court of Appeals found that the statements were admissible under Mississippi Rule of Evidence 803, but failed to address her Confrontation Clause argument. Because the “primary purpose” of the first responder’s “interrogation” was to “enable police assistance to meet an ongoing emergency,” we find no Sixth Amendment violation. Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).
¶ 12. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right “to be con *488 fronted with the witnesses against him.” U.S. Const. amend. VI. In Crawford v. Washington, the United States Supreme Court held that “testimonial” evidence could not be admitted against a criminal defendant unless the declarant was unavailable at trial, and the defendant had had a prior opportunity to cross-examine him. Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Court declined to specifically define the term “testimonial,” but stated that, at a minimum, it included “prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations.” Id.
¶ 13. Two years after Crawford, in Davis, the United States Supreme Court further defined “testimonial” statements:
Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 547 U.S. at 822, 126 S.Ct. 2266. In Davis, the Court held that statements made by a domestic violence victim to a 911 operator[3] were not testimonial, noting that the statements “were necessary to be able to resolve the present emergency, rather than simply to learn (as in Crawford) what had happened in the past.” Id. at 827, 126 S.Ct. 2266.
¶ 14. In February of 2011, the United States Supreme Court decided Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011), which expanded discussions of decisions in Crawford and Davis. In Bryant, the Court held that a victim’s statements[4] to law enforcement officials soon after being found shot in a gas-station parking lot were not testimonial, because the “circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate[d] that the ‘primary purpose of the interrogation’ was ‘to enable police assistance to meet an ongoing emergency.’” Bryant, 131 S.Ct. at 1166-67 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266) (emphasis added).
¶ 15. The Bryant Court held that whether the “ ‘primary purpose of the interrogation was to enable police assistance to meet the ongoing emergency ” is the “ultimate inquiry” when deciding whether a statement is testimonial. Bryant, 131 S.Ct. at 1165 (quoting Davis, 547 U.S. at 822, 126 S.Ct. 2266). In determining the “primary purpose” of an interrogation, courts are to “objectively evaluate the circumstances in which the encounter occurs....” Bryant, 131 S.Ct. at 1156. “That is, the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.” Id.
*489 ¶ 16. When “objectively evaluating the circumstances” of an encounter, courts should consider whether an “ongoing emergency” existed at the time of the encounter,[5] the formality of the encounter between the victim and the police, and the statements and actions of both the declar-ant and the interrogators. Id. at 1157, 1160. The Bryant Court also noted the importance of the victim/declarant’s medical condition in the “primary purpose” determination “to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one.” Id. at 1159.
¶ 17. Turning to the specific facts of the case, the Bryant Court noted that, when the police arrived at the victim’s side, their first question was “what happened,” to which the victim responded with either “ ‘[Bryant] shot me’ or T was shot,’ followed very quickly by an identification of [Bryant] as the shooter.” Id. at 1165. The Court noted that the victim was suffering from a mortal gunshot wound when he made the statements, and that he was “obviously in considerable pain,” and concluded that “we cannot say that a person in [the victim’s] situation would have had a ‘primary purpose ... to establish or prove past events potentially relevant to later criminal prosecution.’ ” Id. (citations omitted).
¶ 18. As for the police officers’ actions, the Court noted:
For their part, the police responded to a call that a man had been shot. As discussed above, they did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred. The. questions they asked— “what had happened, who had shot him, and where the shooting occurred,”— were the exact type of questions necessary to allow the police to “ ‘assess the situation, the threat to their own safety, and possible danger to the potential victim’ ” and to the public, including to allow them to ascertain “whether they would be encountering a violent felon[.]” In other words, they solicited the information necessary to enable them “to meet an ongoing emergency.”
Id. at 1165-66 (citations omitted). And finally, the Court considered the “informality of the situation and the interrogation,” noting that the officers arrived at different times and did not conduct a structured interrogation. Id. at 1166. The Court noted that the “informality suggests that the interrogators’ primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to or focused him on the possible future prosecutorial use of his statements.” Id.
¶ 19. After examining all of the relevant facts surrounding the incident, the Bryant Court ultimately ruled that the victim’s statements were not testimonial and thus did not violate Bryant’s Sixth Amendment confrontation rights:
Because the circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the “primary purpose of the interrogation” was “to enable police assistance to meet an ongoing emergency,” [the victim’s] identification and description of the shooter and *490 the location of the shooting were not testimonial hearsay. The Confrontation Clause did not bar their admission at Bryant’s trial....
Id. at 1166-67.
¶ 20. We find the facts in Bryant analogous to the case at hand. Hendry was dispatched to Sherman’s house after a 911 call reporting a person yelling for help and blowing a horn in his yard. When Hendry arrived and approached Sherman, he “immediately noticed he had large lesions on his skin” and that “large portions of skin were hanging from his chest area and arm....” At that point, Hendry asked one question, “what happened,” to which Sherman replied that his wife had poured burning oil on him while he was asleep. Sherman then asked Hendry to help him look for his medication in the trunk of his car.
¶ 21. Looking objectively at this encounter, we find that Hendry’s simple question of “what happened” was the “exact type of question necessary” to “assess the situation.” Bryant, 131 S.Ct. at 1165-66. And, like the Bryant Court, “we cannot say that a person in [Sherman’s] situation would have had a ‘primary purpose ... to establish or prove past events potentially relevant to later criminal prosecution,’ ” as he was suffering from second- and third-degree burns over a large portion of his body and had asked Hendry to help him locate his medication. Id. at 1165. Finally, the “informality” of Hen-dry’s question to Sherman in his front yard indicates that the “primary purpose” was simply to address what Hendry “perceived to be an ongoing emergency.” Id. at 1166.
¶ 22. Similarly, an objective evaluation of Munger’s[6] interaction with Sherman reveals that its “primary purpose” was to assess Sherman’s condition and treat him. Munger was dispatched to the scene for a “medical emergency involving a burn patient.” When he arrived, he testified that he noticed second-and third-degree burns on Sherman’s head, upper body, arms and hands. He asked “what happened” to “determine how [he] needed to treat [Sherman] medically.” We find that the “primary purpose” of Munger’s inquiry as to “what happened” was to ascertain the cause of Sherman’s injuries in order to treat him properly. Thus, we conclude that Sanders’s Sixth Amendment right to confront the witnesses against her was not violated when the first responders were allowed to relay Sherman’s statements.
CONCLUSION
¶ 23. We clarify that a defendant may not claim the presumption of reasonable fear in self-defense cases when the person against whom defensive force was used was a lawful resident of the dwelling. And we find no Sixth Amendment violation in the trial court’s decision to allow the first responders to relay Sherman’s incriminating statements. We affirm the Court of Appeals? judgment and remand this case to the Hancock County Circuit Court for proceedings consistent with both this and the Court of Appeals’ opinion.
¶ 24. THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED. THE JUDGMENT OF THE HANCOCK COUNTY CIRCUIT COURT IS RE *491 VERSED AND THE CASE IS REMANDED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., RANDOLPH, KITCHENS, CHANDLER AND PIERCE, JJ., CONCUR. KING, J., NOT PARTICIPATING.

. Sanders was not allowed to relate Sherman’s actual statement.

. While both the 'no duty to retreat' rule and the presumption recently have been codified by ... statutes, it has always been the law in this state that one has no duty to retreat from an attack if he is in a place where he has a right to be and is not the initial aggressor or provoker. See McCall v. State, 29 So. 1003 (Miss.1901) ("Flight is one of the means of avoiding danger which was necessary to be made at common law, but is not required in this state.”); Bang v. State, 60 Miss. 571 (1882); Long v. State, 52 Miss. 23, 34 (1876) (explaining that an individual may stand his ground and still be entitled to claim self-defense "so long as he is in a place where he has a right to be ... and is no[t] the provoker [of], nor the aggressor in the combat.”).
Newell v. State, 49 So.3d 66, 74 n. 9 (Miss. 2010).

. The Davis Court noted that "if 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers.” Id. at 823, 126 S.Ct. 2266 n. 2. It left for another day "whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Id.

. The victim died soon after making the statements to the police. Bryant, 131 S.Ct. at 1150.

. "The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account....” Bryant, 131 S.Ct. at 1162.

. We assume, for purposes of today’s appeal, that Munger was an agent of the police for Confrontation Clause analysis purposes. But the parties did not argue this issue, and we "leave for another day,” as the Davis Court did, the issue of "whether and when statements made to someone other than law enforcement personnel are ‘testimonial.’ ” Davis, 547 U.S. at 823 n. 2, 126 S.Ct. 2266.