UNITED STATES of America, Appellee,

v.

Gerald S. SIMPSON, Appellant.

No. 92–3120.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 19, 1993.

Decided May 21, 1993.

Elaine R. Lubin, Washington, DC, Attorney (appointed by the Court), was on the brief, for appellant.

Peter V. Taylor, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, John R. Fisher, Thomas C. Black and Per A. Ramfjord, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before: EDWARDS, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

On October 22, 1991, Gerald S. Simpson ("Simpson") was indicted for possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii), possession with intent to distribute within one-thousand feet of a junior high school in violation of 21 U.S.C. §§ 841(a)(1) and 860(a), possession of dilaudid in violation of 21 U.S.C. § 844(a), and possession of marijuana in violation of 21 U.S.C. § 844(a). On February 19, 1992, after the Government dropped the second count, Simpson was convicted on the remaining three counts. He was subsequently sentenced to 120 months incarceration on the first count and to twelve months for each of the possession counts.

Simpson claims that his conviction should be reversed on several grounds. Two of his claims are meritorious. First, we hold that it was plain error for the trial court to allow the Government to elicit testimony regarding Simpson's prior possession of dilaudid. Second, we hold that Simpson was improperly denied compulsory process when the District Court refused to issue a bench warrant for a witness who may have been essential to Simpson's defense. Because of these errors, we vacate the conviction and remand the case for a new trial.

## I. BACKGROUND

On September 27, 1991, officer Vernon T. Gudger ("Gudger") interviewed a woman who had been raped earlier that day on the 2100 block of 10th Street, N.W. The victim described two assailants, one of whom was a black male of medium complexion, seventeen to eighteen years of age, stocky, 5'9", wearing black pants and a black jacket with silver buttons, and whom she had seen before in the vicinity of the crime. After enlisting another officer to assist him in the search, Gudger came upon Simpson standing at the corner of 10th and V Streets, within a block of the scene of the crime. Simpson is 5'7" tall and weighs approximately 190 pounds. When he was spotted by Gudger, he was wearing a plain burgundy shirt, black denim jeans, black Reebok tennis shoes, and a black leather jacket. Gudger approached Simpson, told him that he was a suspect in a rape investigation, and began questioning him regarding the crime.

At that point, the officers noticed a man standing in the vicinity who fit the descrip-

tion of the second alleged rapist, so they called him over for questioning. During the encounter, the unidentified second man behaved suspiciously, prompting Gudger to frisk him for weapons. The frisk uncovered a gun, and a struggle ensued between officer Gudger and the second man. Other officers soon arrived on the scene in response to a priority call, and eventually officer Paul Rose ("Rose"), among others, disarmed the unidentified man and brought him under control.

Throughout this episode, Simpson remained standing, as he had been instructed, spread-eagle against a police cruiser. After the altercation with the second man, Rose turned toward Simpson and noticed officer Kenneth Furr standing next to him. Rose asked Furr whether he had frisked Simpson, to which Furr replied that he had not. Concerned that Simpson also might have a weapon, Rose frisked Simpson and found a small open-bladed knife in Simpson's jacket. Rose testified that, as he extracted the knife, a cellophane bag fell out of Simpson's pocket and onto the hood of the police car. Believing the bag to contain crack cocaine, Rose immediately placed Simpson under arrest. After a field test confirmed that the cellophane bag contained cocaine base, the officers conducted a search incident to arrest which yielded a vial of dilaudid pills and a box of marijuana.

At a suppression hearing, Simpson moved to have all of the evidence suppressed as unlawfully seized. The District Court denied the motion and the case went to trial, wherein Simpson testified in his own defense. In response to a direct question from the Assistant United States Attorney ("AUSA"), Simpson admitted that he had carried dilaudid on at least one other occasion. When the AUSA attempted to explore the depth of Simpson's prior experience with dilaudid, Simpson denied knowing much about the drug. The AUSA then asked for and received permission from the court to inquire into Simpson's prior conviction for possession of dilaudid to impeach Simpson's proclaimed lack of knowledge.

On the second day of trial, Simpson requested a bench warrant to secure the pres-

ence of an eyewitness who had failed to show up in court pursuant to a subpoena; it was asserted that the eyewitness would testify that he did not see anything fall from Simpson's pocket during his encounter with the police officers. The District Court denied that request and Simpson was convicted of possession with intent to distribute five grams or more of cocaine base, possession of marijuana, and possession of dilaudid.

## II. ANALYSIS

### A. Simpson's Meritless Claims

#### 1. The *Terry* Stop

■ Simpson first contends that the initial investigatory stop was unlawful because Gudger did not have a reasonable articulable suspicion that Simpson was involved in the alleged rape. *See Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). This contention is meritless. Simpson was wearing clothing similar to that described by the victim, was of the same general age group (Simpson was twenty-five years old at the time of arrest), was of the same race and physical build of the alleged rapist, and was in the vicinity of the crime. Generally, a confluence of such factors will be sufficient to justify a *Terry* stop. *See United States v. Clipper*, 973 F.2d 944, 951 (D.C.Cir. 1992) (stop reasonable where suspect with appearance and clothing similar to perpetrator's found near crime scene), *cert. denied*, — U.S. —, 113 S.Ct. 1025, 122 L.Ed.2d 171 (1993); *United States v. Short*, 570 F.2d 1051, 1054 & n. 7 (D.C.Cir.1978) (stop justified where suspect's race, hair style and clothing matched description, and suspect stopped within two blocks of crime scene). Accordingly, it was reasonable for Gudger to temporarily detain Simpson in the course of his investigation.

■ Furthermore, we find nothing untoward about the scope or duration of the *Terry* stop in this case. At the suppression hearing, Gudger testified that only ten minutes elapsed between the time of the initial stop and Simpson's arrest. The trial judge credited this officer's testimony and we, as an appellate court, will overturn such a credibility determination only if it appears to be

clearly erroneous. *See United States v. Williams,* 951 F.2d 1287, 1289 (D.C.Cir.1991). Simpson can point to nothing in the record that would call into question the trial judge's credibility finding in this case. Thus, assuming that the *Terry* portion of the stop lasted only for about ten minutes, the duration of the investigatory stop appears to have been well within the range that we have found reasonable. *See, e.g., United States v. Nurse,* 916 F.2d 20, 24–25 (D.C.Cir.1990) (twenty to thirty minute detention for canine sniff found to be "minimally intrusive" when investigation is conducted diligently); *United States v. Tavolacci,* 895 F.2d 1423, 1427 (D.C.Cir.1990) (fifteen minutes for canine sniff reasonable).

It is also noteworthy that there is nothing in the record indicating that the officers were in any way dilatory in their investigation. *See United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) (to assess whether a detention is too long, Court considered whether police acted diligently). Simpson was detained for approximately ten minutes preceding his arrest, during which time a second man was stopped, frisked, found to be armed, wrestled to the ground by several officers, and disarmed. Since it was not unreasonable for the officers to detain Simpson during this altercation, most of the time that Simpson was detained prior to his arrest was chargeable to reasonable safety precautions rather than dilatory investigation. Thus, the trial judge's conclusions regarding the propriety of the *Terry* stop were not in error.

### 2. The Frisk

■ Simpson next argues that, even if the stop was reasonable and not excessive in duration, he did not pose a sufficient threat to justify Rose's decision to frisk him. Under *Terry,* an officer may frisk a detainee when "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." 392 U.S. at 27, 88 S.Ct. at 1883; *see*

also *United States v. Mitchell,* 951 F.2d 1291, 1295 (D.C.Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1976, 118 L.Ed.2d 576 (1992). Once an officer has decided to frisk a suspect, the scope of the search must be limited "to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884. Under the circumstances as they were understood by Rose at the time of the incident, we cannot fault the officer's frisk of Simpson.

Rose arrived on the scene in response to a call for assistance from officers confronting a suspect with a gun. After assisting other officers in subduing the gunman, he noticed a second man standing in a position to be frisked. Because he knew the circumstances of the alleged rape, Rose reasonably assumed that Simpson was associated with the man whom he had just subdued and that Simpson might also be armed. Further, there is nothing in the record that would cause us to disturb the trial judge's factual finding that the scope of the frisk was within permissible limits.[1] Therefore, we find no error in the District Court's handling of the suppression hearing.

### 3. Excusing a Juror

■ Next, Simpson argues that the trial court improperly excused a juror in the midst of trial. The trial judge explained the dismissal as follows:

We got a note from juror number 9, who got a note from some clinic indicating that the results of some tests—they wanted him to come in right away. Apparently it was nothing more than a blood sugar test; and I would not have been inclined—although I'm not a doctor, I would have consulted with the medical people downstairs.

I would not have been inclined to excuse him if we had lost anybody overnight; we have not so I let number 9 go to the clinic;

---

1. We also reject Simpson's alternative argument that the District Court's factual findings at the suppression hearing were inadequate. Although the trial judge's findings were not detailed, he indicated the facts upon which his legal reasoning was based and articulated specific credibility findings. *See United States v. Gerald Simpson,* No. 91–0598 (D.D.C. Feb. 13, 1992) (transcript of suppression hearing) at 55–56.

so we will move alternate number 1 into number 9's spot.

*United States v. Gerald S. Simpson,* No. 91–0598 (D.D.C. Feb. 19, 1992) at 4–5 (trial transcript) ("Tr. I").

Rule 24(c) of the Federal Rules of Criminal Procedure provides that alternate jurors may replace jurors who "become or are found to be unable or disqualified to perform their duties." FED.R.CRIM.P. 24(c). The determination of whether a juror should be excused pursuant to this rule is left to the trial judge's discretion. *United States v. Sobamowo,* 892 F.2d 90, 95 (D.C.Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 78, 112 L.Ed.2d 51 (1990). Although the trial judge did not verify the juror's claim with the court's medical staff, nothing in the rule or case law suggests that the judge must temper his discretion by performing any particular test to determine whether a juror is competent. In this case, the judge reasonably balanced the nature of the juror's excuse against possible prejudice from the use of an alternate. We find no abuse of discretion in the outcome of this balance.

## B. Simpson's Meritorious Claims

### 1. Rule 404(b) Evidence

■ Simpson argues that the District Court erred by allowing the AUSA to cross-examine him regarding his prior possession of dilaudid. Specifically, Simpson objects to the following colloquy:

**AUSA:** Have you ever seen these yellow pills before?

**Simpson:** Yes.

**AUSA:** Did you have those on you that day?

**Simpson:** No.

**AUSA:** Do you know what they are?

**Simpson:** Yes, I'm familiar with them.

**AUSA:** What are they?

**Simpson:** They [sic] dilaudid, K–4.

**AUSA:** And you're saying that you didn't have any dilaudid on you that day?

**Simpson:** No, sir.

**AUSA:** Have you ever had it on you before?

**Simpson:** Yes, I have.

**AUSA:** And you know that . . . that's a common way for packaging dilaudid, isn't it?

**Simpson:** I wouldn't know that much.

Tr. I at 49–50.

Following the foregoing exchange, the AUSA obtained permission to cross-examine Simpson about a prior arrest for possession of dilaudid in order to impeach his testimony that he did not know how the drug is commonly packaged. When asked, though, Simpson continued to deny knowledge of dilaudid packaging. Thus, after a second bench conference at which time defense counsel objected to any further inquiry into this matter, the AUSA asked: "[s]o what you're saying is that you were not arrested on August 15, 1985, for possession of dilaudid in a similar vial to that one?" Tr. I at 54. Simpson replied, "I was arrested in '85, but I don't recall having no vial." *Id.*

■ Simpson's counsel did not object to the initial question ("[h]ave you ever had it on you before?") and, therefore, Simpson may prevail on his challenge only if the trial court's decision to allow the inquiry amounted to plain error. *See* FED.R.CRIM.P. 52(b); *United States v. Rhodes,* 886 F.2d 375, 379 (D.C.Cir.1989). Under the plain error standard, reversal is mandated to correct particularly egregious errors that would otherwise deprive the defendant of a substantial right. *United States v. Blackwell,* 694 F.2d 1325, 1340–41 (D.C.Cir.1982). Thus, to achieve reversal under the plain error standard, the appellant must show that the complained of error was plain in the sense of being obvious, and that the error substantially undermined the fairness of the trial. *See Rhodes,* 886 F.2d at 380; *Blackwell,* 694 F.2d at 1341–42.

In this case, the AUSA's error during cross-examination should have been apparent. Under the Federal Rules of Evidence,

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

FED.R.EVID. 404(b). During the cross-examination of Simpson, the AUSA made no attempt to characterize the prior bad acts evidence as relevant to any permissible purpose. Indeed, it would have been difficult to do so since the only issue before the jury was whether Simpson actually possessed dilaudid on the day of his arrest. Thus, the only purpose the initial question could have served was to demonstrate Simpson's criminal propensities. The rule against the admission of such evidence is so well established that a violation of it will nearly always qualify as an obvious error. *See Rhodes*, 886 F.2d at 380.

Furthermore, the right affected by the District Court's failure to intercede in this case was substantial. Where the improper admission of prior bad acts evidence is concerned, we measure the substantiality of the right affected by the degree of prejudice that attaches to the admission. *See id.* at 380. In this case, Simpson's defense was that he was not connected with drug trafficking, but was "framed" by Rose. In the minds of many jurors, this defense would appear implausible once Simpson was implicated in the possession of dilaudid on previous occasions, even though the prior possessions did not bear on any issue at trial. Thus, the fairness of the entire proceeding was called into question by the improper admission of this evidence.

In any event, we need not dwell long on our conclusion that the trial court committed plain error in failing to intervene when the AUSA asked the initial question regarding Simpson's prior possession of dilaudid; counsel for the Government all but conceded this point on appeal. The Government contends, though, that because it was able to impeach Simpson with his prior conviction for possession of dilaudid, effectively getting the same information to the jury, whatever error there was in the initial question was somehow rendered harmless. This argument is specious.

In the first place, the Government's logic is circular. The only reason the Government *could* impeach Simpson with the follow-up question ("[s]o what you're saying is that you were not arrested on August 15, 1985, for possession of dilaudid in a similar vial to that

one?") was because Simpson had denied knowledge of dilaudid packaging. However, we certainly cannot say that Simpson's testimony on that point was not tainted by, or a result of, his reaction to the first, impermissible inquiry. Indeed, this seems more likely than not. Second, the Government may not use impermissible means to elicit prejudicial testimony simply because the same testimony *could have been, or subsequently was,* permissibly elicited. The rules of evidence govern both the type of evidence that is to be allowed and the manner in which it is admitted. *See United States v. Foskey*, 636 F.2d 517, 524 n. 6 (D.C.Cir.1980) (courts should consider not only 404(b) evidence, but the manner in which it was presented to the jury). Thus, it is no answer that Simpson's prior conviction came in only for impeachment; at that point, the damage had already been done. Were this the only question before us, Simpson's conviction for possession of dilaudid would be reversed.

## 2. Compulsory Process

There is a second error, however, that requires reversal of Simpson's conviction on all counts. On the second, and final, day of trial, Simpson requested that the trial court issue bench warrants for three witnesses who had been subpoenaed but were not present in court to testify. In requesting the bench warrants, Simpson argued that one of the witnesses in particular, Melvin Dixon ("Dixon"), who was an eyewitness to his encounter with the police, would provide essential exculpatory testimony. Simpson maintained that Dixon would testify that nothing fell from Simpson's pocket during the frisk. The trial judge denied the request, stating:

> if you had testimony that would be exculpatory, even if these folks had a legitimate reason for their not being here, I would be reluctant to give you one further opportunity to get them here.

> But I just have trouble seeing how I can put the case in the deep freeze while we go out and try to find folks that are not going to contribute, to me, anything meaningful to this case; so your request is denied.

Tr. I at 32. Simpson now claims that the court's refusal to issue the bench warrant

denied him his right to compulsory process. We agree.

▮▮▮ Although a decision to issue a bench warrant to compel the appearance of a witness lies within the trial judge's discretion, that discretion is constrained by the defendant's Sixth Amendment right to compulsory process. *See United States v. Goodwin*, 625 F.2d 693, 704 (5th Cir.1980). This is not to say that there is no limit on a defendant's ability to delay trial; where a request is plainly frivolous, the court may refuse to invoke judicial process. *See, id.; see also United States v. Bailey*, 675 F.2d 1292, 1297 (D.C.Cir.) (court properly declined to subpoena witness who could only substantiate a defense that was not valid under the statute), *cert. denied*, 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982). However, in assessing a request for compulsory process, a trial judge may not invade the province of the jury and independently weigh the probativeness of relevant evidence. Once the defendant has alleged facts that, if true, demonstrate the necessity of the witness' testimony, the court is obligated to lend its authority in compelling the sought-after witness' appearance. *See United States v. North*, 910 F.2d 843, 889 (D.C.Cir.1990) (reviewing court must ensure that defendant does not suffer actual prejudice because of inability to obtain compulsory process).

In this case, Simpson made the requisite showing that Dixon's testimony would be relevant to his defense. Simpson's counsel asserted that Dixon, who was allegedly standing about twenty-five feet from Rose and Simpson during the encounter, witnessed the frisk and did not see a bag, or any other object, fall out of Simpson's pocket. This testimony, if believed by the jury, could have substantially undercut the Government's case. In response, the AUSA argued that Dixon was significantly further than twenty-five feet away from the scene of the frisk, and that a small plastic bag could barely be seen at that distance. Accordingly, the AUSA argued that, even assuming that Dixon would be credible, the testimony he would give would not be significantly probative. This argument, though, goes to the weight to be ascribed to Dixon's testimony, not its legal relevance. Further, the dispute between the AUSA and Simpson's counsel concerning the distance between Dixon and the encounter itself highlights an evidentiary or credibility dispute for the jury to resolve. Thus, in accepting the AUSA's argument—finding Dixon's putative testimony not worth the delay—the trial judge improperly resolved a factual question that should have been left to the jury.

Finally, the record does not support a finding that the District Court denied Simpson's request because it was untimely. For one thing, Dixon had been subpoenaed to testify, so the request for his appearance was not an afterthought. In addition, the day when Dixon and the other witnesses failed to appear was the first day on which they were scheduled to testify. Tr. at 22–24. Until that time, there was no cause for Simpson to request judicial intervention. In any event, the trial judge did not rely on the untimeliness of the request as the basis for his decision. Under the circumstances, then, we have no difficulty in concluding that Simpson was denied his right to compulsory process.

## III. CONCLUSION

For the foregoing reasons Simpson's conviction on all counts must be vacated and the case remanded for a new trial.

*So ordered.*