# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00861-COA

**JOSEPH ELONZO HAYNES A/K/A JOSEPH E. HAYNES A/K/A JOSEPH HAYNES**     **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**     **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/2023 |
| TRIAL JUDGE: | HON. CHRISTOPHER LOUIS SCHMIDT |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | CHRIS JOHNSON |
| | DONALD RAFFERTY |
| | BLAKE THORNBRO |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: CASEY BONNER FARMER |
| | ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | WILLIAM CROSBY PARKER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | REVERSED AND REMANDED - 01/28/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Joseph Haynes was convicted of manslaughter. On appeal, Haynes argues that (1) the evidence is insufficient to support his conviction, (2) the jury's verdict is against the overwhelming weight of the evidence, (3) the trial court erred when it did not issue an instanter warrant for a defense witness who failed to appear at trial, and (4) the trial court abused its discretion by refusing to give a "stand-your-ground" jury instruction. We conclude the trial court committed reversible error by denying a stand-your-ground instruction. We also conclude that the State presented sufficient evidence to sustain

Haynes's conviction. Therefore, we reverse and remand the case for a new trial without reaching Haynes's remaining issues on appeal.

## FACTS AND PROCEDURAL HISTORY

¶2. On May 8, 2021, Haynes and several friends—including Chris Paige ("Paige"), Chris Reed ("Reed"), and Paige's sister Iesha ("Iesha")—were celebrating Haynes's and Iesha's birthdays at a house in Pass Christian. Around midnight, the group decided to go to the Third Base Lounge ("Third Base") in Bay St. Louis. Haynes and Reed each drove their own cars, and Iesha or someone else drove her Dodge Charger and parked it directly outside the front entrance to Third Base. Witnesses testified that Third Base was "packed," and dozens of people were socializing in the parking lot because the bar had exceeded its capacity.

¶3. Around 2 a.m., another group of friends—Dajour Maddox, Yuri Lizana, and Jermaine Watts—arrived at Third Base. Around 3:30 a.m., Lizana and Watts began arguing with Paige about whether Iesha's Charger had a V6 engine or a "Hemi." The argument escalated and ended with Haynes shooting Watts. Watts died at the scene. Haynes turned himself in the following evening and was later indicted for first-degree murder.

¶4. Iesha testified that she spent most of her time at Third Base in the parking lot near her Charger with Paige. Iesha stated that just before the shooting, "[e]veryone was arguing [and] making threats" about the car's engine. She acknowledged that Paige was involved in the argument. Within minutes after the argument began, Iesha heard gunshots, but she did not see the shooting. Iesha testified that Watts was carrying a liquor bottle around the parking lot, but she did not hear him make any threats. Iesha did not see Watts and Haynes interact

2

prior to the shooting.

¶5.    Maddox testified that after he arrived at Third Base, he went inside while his friends Lizana and Watts stayed in the parking lot. Maddox testified that he remained inside Third Base until the shooting occurred, but he stated that he overheard the argument and witnessed the shooting from where he was sitting at the bar. Indeed, Maddox claimed that he was only "ten feet" away when he saw Haynes shoot Watts. Maddox testified that prior to the shooting, the two groups were engaged in a "normal conversation" about the "performance of the cars," and there was "no reason for hostile [sic]." Maddox stated that he did not see Watts carrying a liquor bottle or strike or threaten anyone before the shooting.

¶6.    Dr. Staci Turner, the chief medical examiner for the State, testified that Watts died from a gunshot wound. One bullet entered Watts's back and then hit his left lung, the left ventricle of his heart, his aorta, and his right lung before exiting through his chest. Turner testified that Watts also had "graze wounds" on the bottom of his chin, his chest, and his forearm, meaning that bullets "just grazed across the skin" and did not enter his body. Haynes turned his Ruger 9mm handgun over to police, and it was admitted into evidence. Police found two 9mm shell casings in the road just outside the parking lot.

¶7.    Reed testified at trial as a defense witness. He arrived at Third Base around midnight with Paige, Iesha, Haynes, and others. Around 3 a.m., the group was about to leave when Lizana and Watts began arguing with them about the Charger's engine. Reed testified that Paige and Lizana were at the center of the argument and that Watts was standing behind Lizana holding a liquor bottle. Reed testified that when the argument escalated, he tried to

3

calm down Watts and others, but he was unsuccessful. Reed felt unsafe, so he left and went to his car, which was parked next door. Several minutes later, he heard gunshots.

¶8. Haynes testified in his own defense. Haynes joined the Army after obtaining an associate's degree in criminal justice from Mississippi Gulf Coast Community College. He was on active duty for seven years and was deployed to Iraq and Kuwait before transferring to the National Guard in 2021. He is married, and he and his wife have two children.

¶9. Haynes testified that on May 8, 2021, his good friend Paige asked him to come to a birthday party for Paige's sister Iesha. Haynes testified that he and Iesha have the same birthday and would normally celebrate together when he was in town. Haynes stated that he did not drink any alcohol that night because he was driving. He was carrying a gun in a holster on his side, which was his normal practice. Haynes testified that Iesha's party moved from her home to Third Base around midnight. At Third Base, Haynes played pool and darts and socialized inside and in the parking lot. Like other witnesses, Haynes testified that Third Base was "packed" that night.

¶10. Haynes had never met Watts, Lizana, or Maddox prior to May 9, 2021. Haynes noticed Watts in the Third Base parking lot. According to Haynes, Watts was drinking from a bottle of Crown Royal whisky and "talking reckless" or "talking trash" to others "in general." More specifically, Haynes testified that Watts, who was from Gulfport, was talking about "these Pass [Christian] n******" and "these Bay [St. Louis] n******." Haynes said that Watts was clearly drunk. When Haynes first saw Watts, the Crown Royal bottle was half full. When Haynes saw Watts later, the bottle was nearly empty.

¶11.    Around 3 a.m., there was a disturbance inside Third Base, and Haynes and his friends decided to leave and go to Waffle House.  When Haynes stepped outside, Paige was in the driver's seat of Iesha's Charger, which was parked just outside the front door.  Haynes testified that Paige and another man were arguing about the car's engine.  Haynes later learned that Lizana was the man arguing with Paige.  Haynes thought that the argument was about "more than just the car" and that Lizana and Paige were each trying to be "louder" and "manlier" than the other.  According to Haynes, he tried to get Lizana to calm down and move on, but Lizana "was drunk" and full of "liquid courage" and would not listen.  Haynes testified that Watts was nearby talking to Reed.  Eventually, the argument seemed to have subsided, and Haynes was about to walk away when he heard another commotion.  Haynes testified that Lizana walked to the front of the Charger and "continued to talk shit, bringing [Watts] into the fold."  Reed had walked away by this point.  Haynes testified that a fight started, and suddenly Paige was in "a fight with" both Lizana and Watts.  Haynes testified that he tried to separate the men and "de-escalate the situation," but Watts punched him in the mouth, causing him to stumble back.  According to Haynes, Watts then said, "I got something for you n******" and appeared to be "reaching for a weapon."  Haynes stated that he then drew his own gun and shot Watts in self-defense because he believed that his and Paige's lives were in danger.  Haynes testified that he fired his gun twice.  He then heard someone else from Watt's group say they had "some shit in the cars."  Haynes interpreted this to mean that they had guns in their cars, so he left quickly.

¶12.    Haynes testified that the fistfight and shooting happened in the "[b]link of an eye" and

5

that there was no "other decision he could have made at the moment [he] pulled [his] gun to defend [him]self." Haynes said the "only choice" he had "at that point" was to "defend [him]self with [his] firearm." He said he had "no intention of killing" Watts that night and "was simply defending [him]self." Haynes claimed that he was only trying to be a "peacemaker" and "de-escalate the situation" until Watts punched him in the mouth and appeared to be reaching for a weapon. Haynes went home after the shooting and later turned himself in to the Bay St. Louis Police Department.

¶13. On cross-examination, the State questioned Haynes repeatedly as to why he did not leave before the fight, as Reed had. The State first questioned Haynes as follows:

Q. Christopher Reed said he left Mr. Watts because the words, a concern that Mr. Watts made?

A. He said that it was an unhealthy and dangerous conversation.

Q. That's right. Mr. Watts was complaining about some of the conversation. And Mr. Reed felt like it was getting unsafe, so he left. *Why didn't you leave?*

A. I was proceeding to leave, sir.

Q. *But you didn't, you shot Jermaine Watts.*

A. I didn't leave because a fight broke out amongst Mr. Watts, Mr. Lizana, and Christopher Paige.

(Emphasis added). Later, the State again questioned Haynes about his "options" and "forks in the road" and suggested that he should have "[w]alk[ed] off like Christopher Reed":

Q. You would agree with me when we encounter difficult situations in life there is usually options, right?

A. Yes.

. . . .

Q. We've heard them characterized as forks in the road, we can make a choice, we either go one way or the other?

A. Yes, sir.

Q. Calling the police was one of those paths, right, if it was getting scary out in front of Third Base Lounge that night?

A. It didn't seem like it was going to go that way, sir. I thought it was over with the first time I deescalated the argument.

Q. *Walking off like Christopher Reed, it's another fork in the road, right?*

A. It is.

Q. Maybe just having a good old fashioned fist fight, that's another fork in the road?

A. It is, sir, but when you are assaulted and somebody says I got something for you n*****s, I take that as I'm going to shoot you, I'm going to kill you.

(Emphasis added). The State later returned to the same subject, pressing Haynes to admit

that Reed showed "better judgment" than him by walking away:

Q. But you want this jury to believe it was some two on one scenario?

A. It was, sir, because the party that -- Christopher Reed was already in his car. That's how scared he was. He was already in his car, and I was just went talking to Jermaine Watts.

Q. *Or maybe he just had better judgment, would you not agree?*

A. Because he just -- because he got scared and walked away. I was walking away as well until the fight broke out.

(Emphasis added).

¶14. Haynes called three other witnesses. Cassie Duvernay was at Iesha's birthday party

7

and Third Base but left long before the shooting. A National Guard officer and a Pass Christian policeman testified that Haynes had a reputation for peacefulness and honesty.

¶15. Despite being under subpoena, Paige did not appear or testify at Haynes's trial. The issue of Paige's potential absence first arose at a hearing two weeks before trial. Haynes had filed a motion to continue the trial because two private investigators had been unable to locate Paige or serve him with a subpoena. The prosecutor informed the court that the State also had made "continuous attempts to try to interview" and subpoena Paige, noting that Paige "fled from the scene" after the shooting and had avoided talking to law enforcement ever since. The prosecutor said he "would expect [Paige] would know something" about the shooting because "other witnesses [had] suggest[ed] that he may have been the person who initiated the conflict that led to this shooting." The court reserved ruling on the motion, reasoning that there was still time to find Paige prior to trial.

¶16. At a hearing one week before trial, Haynes's counsel informed the court that despite his best efforts, he still had not been able to talk to Paige or serve him with a subpoena. The State also had not been able to interview Paige or served him with a subpoena.

¶17. On the day trial was set to start, Haynes advised the court that his investigator had finally served Paige with a subpoena that very morning. After he was served, Paige called Haynes's attorney. Paige was "very angry" and indicated that he would not appear at trial. According to the attorney, Paige acknowledged that he had been involved in the argument that led to the shooting, and he talked about the "demeanor" of others who were involved; yet he also insisted that he did not "know anything" about the shooting and did not "want to

8

have anything to do with" the trial. The court instructed Haynes's attorney to tell Paige that if he violated the requirements of his subpoena, the court would issue a warrant for his arrest, and he would risk being jailed for contempt of court.

¶18. At the end of the second day of trial, Paige still had not complied with his subpoena, and Haynes's attorney advised the court that Paige would not answer his or his staff's phone calls. According to the attorney, Paige had stated that Lizana, Watts, and Maddox approached him while he was seated in Iesha's car, that an "argument" or "confrontation" ensued, and that "he [(Paige)] actually had to push him [(Lizana, Watts, or Maddox)] away." But Paige also claimed that "after that," "he didn't see or hear nothing." Haynes's attorney's "perception" was that Paige was "try[ing] to convince [the attorney] he didn't have to be a witness" at trial. Counsel then requested that the court issue an instanter warrant to take Paige into custody and bring him to court.

¶19. In response, the court asked Haynes's attorney whether he was representing "as an officer of the court" that he "intend[ed] to call [Paige] as a witness." Haynes's attorney (Mr. Rafferty) answered, "Absolutely, Judge." The following exchange then ensued:

> THE COURT: Because if we go get him and we go through all of this and you choose not to call him, then the court is going to be perhaps persuaded to look to other avenues of relief on this issue and that would not be against Mr. Paige necessarily.
>
> MR. RAFFERTY: Yes, sir. That's a great question, Judge. I will be direct with you. Right now, Judge, I'm more concerned about him failing to live up to the subpoena than I am about what his testimony is going to be. I think I will be able to go forward with my case right now, but, Judge, he was a critical part and that's why we had to go have him

9

served. But, Judge --

THE COURT: I equally don't appreciate his failure to abide by the court process. But calling a witness that you don't know that -- having the court -- asking the court to issue an instanter bench warrant for him on a witness that you are not going to call, what, you know, is --

MR. RAFFERTY: Then I would request a show cause and have a hearing why he shouldn't be at least instructed on the severity of disregarding a subpoena, Your Honor.

The prosecutor reported that the State still had not spoken to Paige, although Paige's mother had contacted the prosecutor. He told Paige's mother that Paige needed to obey the subpoena. The prosecutor offered to arrange for Paige to testify at a convenient time in the State's case-in-chief, but he never heard back from Paige or his mother.

¶20. The court then denied Haynes's request for an instanter warrant, stating as follows:

Mr. Rafferty at this time is asking for an instanter subpoena or a bench warrant to effect the arrest of Mr. Paige and hold him until such time as he would testify. Because of the announcement that -- my summary here, given his inconsistent statements to counsel, that he is not a will call witness, so what the court is going to do is at the appropriate time I'll have the clerk issue a show cause to return for a date certain to address the contempt issues. But the issue that I don't think is actually before the court for relief, the issue of issuing a bench warrant for Mr. Paige's arrest, is not appropriate at this time.

¶21. The jury was instructed on the indicted offense of first-degree murder and the lesser-included offense of imperfect self-defense manslaughter. The trial court also gave several instructions regarding self-defense, but the court refused Haynes's request for an instruction regarding Mississippi's "stand-your-ground" law. *See* Miss. Code Ann. § 97-3-15(4) (Rev. 2020). During deliberations, the jury sent out a note that read, "What is the language of Mississippi's stand your ground law[?]" The court instructed the jurors that they had

"received all the instructions in this case" and to "continue [their] deliberations."

¶22.    The jury ultimately convicted Haynes of manslaughter. The court sentenced Haynes to serve fourteen years in the custody of the Department of Corrections. Haynes filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal. The court granted Haynes's motion for bond pending appeal.

¶23.    Six days after the trial, the court held a show-cause hearing for Paige. After hearing Paige's testimony, the court found Paige in contempt of court for failure to obey his subpoena and sentenced him to twenty-four hours in jail. During the show-cause hearing, Paige was not questioned about the shooting or the events leading up to it.

## ANALYSIS

¶24.    On appeal, Haynes argues that (1) the evidence is insufficient to support his conviction, (2) the jury's verdict is against the overwhelming weight of the evidence, (3) the trial court erred by not issuing an instanter warrant for Paige, and (4) the trial court abused its discretion by denying a "stand your ground" jury instruction.

¶25.    We conclude the trial court committed reversible error by denying a stand-your-ground jury instruction. We also conclude that the State presented sufficient evidence to sustain Haynes's conviction for manslaughter.[1] Therefore, we reverse Haynes's conviction and remand the case for a new trial. Because we order a new trial, it is unnecessary to

---

[1] We must address Haynes's challenge to the sufficiency of the evidence even though we reverse and remand the case for a new trial on other grounds. *Newell v. State*, 175 So. 3d 1260, 1267-68 (¶5) (Miss. 2015). We address the issue because we would reverse and render Haynes's conviction—and the Double Jeopardy Clause would bar a retrial—if we found that the State had presented insufficient evidence to support the conviction. *Id.*

11

address Haynes's remaining issues on appeal.[2]

## I. Stand-Your-Ground Instruction

¶26. At the jury instruction conference, Haynes requested a "stand-your-ground" instruction.[3] He argued that he was entitled to the instruction because he had a right to be in the parking lot and, according to his testimony, was not the initial aggressor and shot Watts

---

[2] Although we need not address the trial court's refusal to issue an instanter warrant to bring Paige to court, we note that a court's discretion to refuse to issue such a warrant "is constrained by the defendant's Sixth Amendment right to compulsory process." *United States v. Simpson*, 992 F.2d 1224, 1230 (D.C. Cir. 1993) (citing *United States v. Goodwin*, 625 F.2d 693, 704 (5th Cir.1980)). "This is not to say that there is no limit on a defendant's ability to delay trial; where a request is plainly frivolous, the court may refuse to invoke judicial process." *Id.* "However, in assessing a request for compulsory process, a trial judge may not invade the province of the jury and independently weigh the probativeness of relevant evidence." *Id.* "Once the defendant has alleged facts that, if true, demonstrate the necessity of the witness' testimony, the court is obligated to lend its authority in compelling the sought-after witness' appearance." *Id.*

Here, multiple witnesses indicated that Paige was at the center of the argument that ultimately led to the fatal shooting. Other than perhaps Lizana, who also did not testify, Paige was more likely to provide the jury with relevant and material testimony than any other witness. We would suggest that in future cases, courts not hesitate to issue warrants, when necessary, to compel the attendance of such a material witness.

[3] The requested instruction (D-5) stated:

The Court instructs you the jury that an accused has the right to "stand his ground." The Court further instructs you that a person need not retreat before resisting an attack. The Court also instructs the jury that the danger that justifies one person taking another person's life must be immediate, pending, and present, even if there are other options available to such person.

The Court instructs the jury that there is no requirement under Mississippi law that Joseph Haynes is required to flee from the danger to his body or life.

If you find that Joseph Haynes was in a place where he had a right to be and Joseph Haynes was not the initial aggressor or provoker, then Joseph Haynes has/had no duty to flee or retreat and does not lose his right to self-defense.

12

in self-defense. *See* Miss. Code Ann. § 97-3-15(4). However, the trial court questioned whether Haynes was entitled to such an instruction under this Court's decisions in *Lewis v. State*, 374 So. 3d 529 (Miss. Ct. App. 2023), and *Shaheed v. State*, 205 So. 3d 1105 (Miss. Ct. App. 2016). In *Lewis* and *Shaheed*, this Court stated, "The Mississippi Supreme Court and this Court have held that it is within the trial judge's discretion to refuse a 'stand your ground' instruction when the defendant's own testimony is that he had no time or opportunity to retreat, and there is nothing in the evidence to suggest to a reasonable juror that the defendant could have retreated but did not do so." *Lewis*, 374 So. 3d at 545 (¶56) (quoting *Shaheed*, 205 So. 3d at 1112 (¶24)). The State argued that the trial court should refuse the instruction because "while the State did cross [Haynes] quite a bit on the opportunity to retreat," Haynes "steadfastly stood by the fact that he did not have the opportunity to do that" and testified that he made "a split second decision" to shoot Watts in self-defense. In response, defense counsel argued that the State's cross-examination of Haynes regarding his opportunity to retreat only "strengthened" Haynes's right to the instruction. The trial court agreed with the State and refused the instruction "based on . . . *Lewis* and *Shaheed*."

¶27.   As noted above, during deliberations, the jury sent the judge a note asking, "What is the language of Mississippi's stand your ground law[?]" Without objection, the court responded by instructing the jurors that they had "received all the instructions in this case" and to "continue [their] deliberations."

¶28.   On appeal, Haynes argues that he was entitled to a stand-your-ground instruction. Haynes argues that "he never once testified he had no chance to retreat," although he did

13

testify that he made a split-second decision to shoot Watts in self-defense and believed, at the moment he fired the fatal shot, that he had no other option.

¶29. Mississippi's stand-your-ground or "no duty to retreat" principle is codified in Mississippi Code Annotated section 97-3-15(4), which provides:

> A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable.

¶30. "[T]he standard of review for the denial of jury instructions" in this context "is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). "[T]he instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Id*. (quoting *Rubenstein v. State*, 941 So. 2d 735, 785 (Miss. 2006)). The "defendant is entitled to have jury instructions which present his theory of the case," but "the court may refuse an instruction [that] incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence." *Id*. at 74 (¶20) (quoting *Hearn v. State*, 3 So. 3d 722, 738 (¶45) (Miss. 2008)). "Nonetheless, [the Mississippi Supreme] Court has held that a defendant is entitled to have every legal defense he asserts to be submitted as a factual issue for determination by the jury under proper instruction of the court." *Williams v. State*, 343 So. 3d 1035, 1037 (¶14) (Miss. 2022) (quotation marks omitted).

¶31. In the present case, the trial court gave the following instructions regarding self-defense:

14

<u>JURY INSTRUCTION #9</u>

The Court instructs the jury that to make a killing justifiable on the grounds of self-defense, the danger to the defendant must be either actual, present and urgent, or the defendant must have reasonable grounds to believe that the victim intended to kill the defendant or to do him some great bodily harm, and in addition to this, he must have reasonable grounds to believe that there is imminent danger of such act being accomplished.  It is for the jury to determine the reasonableness of the grounds upon which the defendant acts.  If you, the jury, unanimously find that the defendant acted in self-defense, then it is your sworn duty to return a verdict in favor of the defendant.

<u>JURY INSTRUCTION #10</u>

The Court instructs the Jury that while a Defendant may stand his ground and resist force by force, the resistance or force used by the Defendant may not be disproportionate to the attack or force used by the victim.

<u>JURY INSTRUCTION #11</u>

The Court instructs the Jury that a person may not use more force than reasonably appears necessary to save his life or protect himself from great bodily harm.  Where a person repels an assault with a deadly weapon, the question of whether he was justified in using the weapon is for determination by the jury.

The law tolerates no justification and accepts no excuse for an assault with a deadly weapon on the plea of self defense except that the assault by the Defendant on the victim was necessary or apparently so to protect the Defendant's own life or his person from great bodily injury and there was imminent danger of such design being accomplished.  The danger to life or of great personal injury must be or reasonably appear to be imminent, present at the time the Defendant commits the assault with a deadly weapon.  The term "apparent" as used in "apparent danger" means such overt, actual demonstration by conduct and acts of a design to take life or do some great personal injury as would make the killing apparently necessary to self preservation.

<u>JURY INSTRUCTION #12</u>

The Court instructs the Jury that . . . a person who provokes a difficulty or attempts to commit a crime upon another and remains the aggressor

throughout that difficulty cannot invoke the plea of self-defense; and if you find from the evidence in this case beyond a reasonable doubt that the defendant . . . provoked the difficulty with Jermaine Watts, or attempted to commit the crime of murder upon him, and remained the aggressor in the difficulty, then the defendant cannot now invoke the plea of self-defense.

## JURY INSTRUCTION #13

The Court instructs you, the Jury, that a Defendant who claims Self-Defense is permitted to claim the benefit of any apparent, as well as, of any real danger that the facts afforded him at the time of the incident. The Court instructs the Jury that a Defendant may act upon the facts of the case as they reasonably appeared to him.

The Court further instructs the Jury that in passing up on the action of the Defendant, the Jury should not try the Defendant by the light of after developed events, nor hold him to the same cool and correct judgement which they are able to form at a later time. You the Jury should put yourself in the Defendant's place and judge his acts by the facts and circumstances by which he was surrounded at the time of the event.

## JURY INSTRUCTION #14

The Court instructs the Jury that the defense of another permits the use of force commensurate with the force offered. The proof in mounting such a defense must demonstrate that the facts present at the time of the killing are such as to justify the belief of reasonable men that it appeared necessary to use deadly force in order to prevent the felonious killing of another.

¶32. These jury instructions correctly state the law in parts; however, we conclude that when read together as a whole, these instructions do not fully and fairly announce the law applicable to the case at hand. Specifically, Haynes was entitled to a jury instruction on Mississippi's stand-your-ground law because there was a foundation for it in the evidence, and the principle that Haynes had no duty to retreat was not fairly covered elsewhere in the instructions. *See Williams*, 343 So. 3d at 1041 (¶30).

¶33. To begin, while Jury Instruction No. 10 mentions that "a Defendant may stand his

16

ground," it does not fully explain the extent of that right, the circumstances under which it applies, or its implications for a claim of self-defense. As stated above, Mississippi's stand-your-ground law provides that "[a] person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force" in self-defense "if the person is in a place where the person has a right to be." Miss. Code Ann. § 97-3-15(4). The statute further states that "no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was unnecessary, excessive or unreasonable." *Id.* The instructions actually given to the jury in Haynes's trial fail to mention or explain either of these concepts. Thus, it is evident that these rules are not "covered fairly elsewhere in the instructions." *Newell*, 49 So. 3d at 73 (¶20) (quoting *Hearn*, 3 So. 3d at 738 (¶45)).

¶34. Importantly, the jury was not instructed that Haynes had no duty to retreat if given the opportunity, and this is especially important in light of the risk that the jury may have considered Haynes's failure to retreat as evidence that his use of force was unnecessary, excessive or unreasonable. *Williams*, 343 So. 3d at 1041 (¶29). Instead, Jury Instruction No. 10 emphasized Haynes's duty to use force that was "not disproportionate to" the alleged attack by Watts. This statement of law, while correct, was incomplete.

¶35. The State argues on appeal that no testimony or evidence suggested that Haynes had an opportunity to retreat; however, at trial, the State's cross-examination of Haynes created a factual basis for the instruction. As set out above, the State repeatedly questioned Haynes about the fact that Reed walked away after the argument had begun but before any punches

17

were thrown or shots fired. The State asked Haynes "[w]hy didn't [he] leave" like Reed. And on cross-examination, Haynes even agreed that his opportunity to "[w]alk[] off like Christopher Reed" was "another fork in the road" that preceded the fatal shooting. Still later, the State asked Haynes whether he agreed that Reed "just had better judgment" than Haynes because Reed walked away before the shooting. Haynes agreed that Reed "got scared and walked away" before the argument turned violent.

¶36. In *Sanders v. State*, 77 So. 3d 497 (Miss. Ct. App. 2011), *aff'd*, 77 So. 3d 484 (Miss. 2012), the defendant (Sanders) and her husband (Sherman) were in their home when the two became involved in a physical altercation. *Id.* at 499 (¶2). Sanders testified that during the fight, "Sherman let go of her and headed toward their bedroom in the back of the house." *Id.* at 500 (¶5). Sanders further testified

> that she followed Sherman to the bedroom in fear of her life and the lives of her children and on the way, she reached for the nearest weapon she could find—a pot of hot oil that she had heated on the stove to cook a late-night snack. Upon reaching the bedroom, . . . she found Sherman reaching for his gun and then turning to her with it. It was then that she tossed the pot of oil on him and fled from the house with her children.

*Id.* The hot oil caused severe and ultimately fatal injuries. *Id.* at 499 (¶2). At trial, Sanders testified that she killed Sherman in defense of herself and her children; however, the trial court refused Sanders's request for a stand-your-ground jury instruction, and the jury convicted Sanders of murder. *Id.* at 500 (¶7).

¶37. On appeal, this Court noted that both Sanders and her daughter testified that she was not the initial aggressor. *Id.* at 503 (¶22). In addition, she "was not engaged in unlawful activity and, clearly, had a right to be in her own home." *Id.* Moreover, this Court noted that

18

the State's cross-examination of Sanders emphasized her opportunity to avoid the danger by simply exiting the home. *Id.* at (¶23). This Court stated:

> The prosecution repeatedly attempted to elicit testimony from Sanders on cross-examination regarding her ability to exit the home during the attack. On at least one occasion, the prosecution blatantly said to Sanders: "There's a door right there, a front door right there . . . you could have went [sic] out that door, correct?" As such, the jury was completely unaware that Sanders *did not have a duty to retreat* from her home, but instead, she had the right to remain in her home and defend herself and her children to whatever degree necessary to avoid the great bodily harm and imminent death that Sanders testified she feared from Sherman. *Furthermore, due to the prosecution's pointed statements regarding Sanders's ability to retreat, the jury was, in fact, directed to note that Sanders may have been able to escape through an exit door of the home.*

*Id*. (emphasis added). Accordingly, this Court concluded that the refusal to give a stand-your-ground instruction "improperly allowed to consider Sanders's failure to retreat as evidence that her use of force was unnecessary, excessive or unreasonable." *Id*. at (¶24). We further held that the refusal to instruct the jury on Sanders's right to stand her ground—and the absence of any duty to retreat—was "reversible error." *Id.*

¶38. In *Williams*, the Mississippi Supreme Court reached a similar conclusion, relying on this Court's opinion in *Sanders*. *Williams*, 343 So. 3d at 1040-41 (¶¶26-30). In *Williams*, the defendant (Courtney) lived with her father (James), her boyfriend (CJ), and her two children. Courtney and CJ testified that during an argument, James first choked Courtney and then struck CJ and "got on top of CJ, pinning CJ to the ground." *Id.* at 1036 (¶7). At that point, Courtney retrieved a knife from the kitchen and "stabbed James twice in the back while James was on top of CJ." *Id.* Courtney claimed that she stabbed James in defense of herself and CJ; however, the trial court refused to give a stand-your-ground jury instruction,

19

and the jury convicted Courtney of manslaughter. *Id.* at 1036-38 (¶¶8, 13-18).

¶39. On appeal, the Supreme Court noted that Courtney and CJ both testified that James was the initial aggressor, Courtney was not involved in unlawful activity, and she had a right to be in the home. *Id.* at 1038 (¶19). However, the State argued that the trial court properly refused instructions regarding Courtney's right to stand her ground and the absence of a duty to retreat because those principles were "fairly covered in other instructions." *Id.* at (¶20). The State also argued that there was no "evidentiary foundation" for the instructions.

¶40. The Supreme Court rejected the State's first argument, reasoning that "none of the [three self-defense] instructions [given at the trial] explicitly refer[red] to Courtney's right to stand her ground." *Id.* at 1039 (¶24). The State argued that three jury instructions regarding Courtney's right to defend herself and others were sufficient because they "implicitly" conveyed that she "had a right to stand and fight." *Id.* at 1039-40 (¶24). But the Supreme Court held that the instructions given at trial were inadequate because "nothing in [them] explained to the jury that Courtney had no duty to retreat if given the opportunity. Instead, the instructions simply instructed the jury that Courtney's actions were justifiable if 'committed by Courtney in the lawful defense of herself or of another person." *Id.* (quotation marks and brackets omitted).

¶41. In addition, the Supreme Court concluded that there was a sufficient "factual basis" for the stand-your-ground instructions Courtney requested. *Id.* at 1040 (¶25). Courtney satisfied the requirements of section 97-3-15(4), and "the record reflect[ed] that Courtney had the opportunity to retreat and could have retreated to avoid the conflict" but, instead,

"stood her ground to defend CJ." *Id.* Moreover, after discussing this Court's opinion in

*Sanders*, the Supreme Court stated as follows:

> Here, as in *Sanders*, the State "repeatedly attempted to elicit testimony from [Courtney] on cross-examination regarding her ability to exit the home during the attack." [*Sanders*, 77 So. 3d at 503 (¶23).] Indeed, the record reflects that the State suggested that Courtney could have "gone out the door that is right beside the kitchen," but instead "came back" with a "large knife" and "plunged it in [her] father's back." When Courtney testified that she was scared, the State responded, "[b]ut you weren't so scared that you didn't run out of the door." Later, the State again suggested that Courtney "could have r[u]n" and "could have exited the door if she felt her life was in danger." Moreover, Investigator Terry Gann testified that Courtney "could have fled" and that in his opinion she had a duty to flee.

*Williams*, 343 So. 3d at 1040-41 (¶28). The Court concluded that "[a]s in *Sanders*, the jury

was not instructed of Courtney's rights to stand her ground under Section 97-3-15(4). As a

result, the jury could have 'consider[ed] [Courtney]'s failure to retreat as evidence that her

use of force was unnecessary, excessive, or unreasonable.'" *Id.* at 1041 (¶29) (quoting

*Sanders*, 77 So. 3d at 503 (¶24)). The Court held that the refusal of stand-your-ground

instructions was reversible error because the instructions actually given did not "fairly

announce the law of the case and create[d] an injustice." *Id.* at (¶30).

¶42.    The present case is similar to *Sanders* and *Williams*. Haynes testified that he was not

the initial aggressor. Rather, according to Haynes, Watts hit him in the mouth and then

appeared to be reaching for a weapon. In addition, there is no evidence that Haynes was

engaged in unlawful activity, and he was lawfully in the parking lot. Moreover, similar to

both *Sanders* and *Williams*, the State repeatedly cross-examined Haynes as to why he did not

leave before the shooting like his friend Reed. The State referred to this as a "fork in the

21

road" that could have avoided the fatal shooting and even suggested that Reed showed "better judgment" than Haynes by just walking away rather than remaining in the parking lot. On cross-examination, Haynes agreed that he could have walked away like Reed. The jury should have been instructed that if Haynes was not the initial aggressor, then he had no duty to retreat. Because no such instruction was given, as in both *Sanders* and *Williams*, there is a risk that the jury could have "consider[ed] [Haynes's] failure to retreat as evidence that [his] use of force was unnecessary, excessive, or unreasonable." *Williams*, 343 So. 3d at 1041 (¶29) (quoting *Sanders*, 77 So. 3d at 503 (¶24)).

¶43. In addition, as in *Williams*, "none of the instructions" given at Haynes's trial "explicitly refer to [Haynes's] right to stand [his] ground." *Id.* at 1039 (¶24). The instructions given at trial correctly state the law in parts, but none explained the circumstances under which Haynes had a right to stand his ground. Nor do any of the other instructions explain that if Haynes was not the initial aggressor in the altercation, his failure to walk away prior to the shooting could not be considered evidence that his use of force was unnecessary, excessive, or unreasonable. Miss. Code Ann. § 97-3-15(4). Thus, the instructions actually given at Haynes's trial did not "fairly announce the law of the case and [did] create an injustice." *Williams*, 343 So. 3d at 1041 (¶30). This conclusion is especially true given that the State's cross-examination of Haynes clearly invited the jury to consider Haynes's failure to walk away from the argument. We also note that during deliberations, the jury indicated confusion on this very subject, sending out a note asking for "the language of Mississippi's stand your ground law."

22

¶44.    We also conclude that the trial court erred by refusing Haynes's proposed stand-your-ground instruction based on this Court's decisions in *Shaheed* and *Lewis*. In *Shaheed*, this Court stated:

> The trial judge did not abuse her discretion by denying this "stand your ground" instruction. The Mississippi Supreme Court and this Court have held that it is within the trial judge's discretion to refuse a "stand your ground" instruction when the defendant's own testimony is that he had no time or opportunity to retreat, and there is nothing in the evidence to suggest to a reasonable juror that the defendant could have retreated but did not do so. That is the case here. Shaheed's version was that he and Truss [(the victim)] struggled; that Truss broke free and immediately reached for his pistol, which was in his waistband; and that he quickly shot Truss only to prevent Truss from shooting him. The State's version was that Shaheed shot Truss in the head as Truss backed away with his hands raised. Neither version or any other evidence in the record pointed to an opportunity to retreat. Furthermore, other instructions adequately covered the general rules of law pertaining to self-defense. Accordingly, the trial judge did not abuse her discretion by denying Shaheed's proffered "stand your ground" instruction.

*Shaheed*, 205 So. 3d at 1112-13 (¶24) (citations omitted). Likewise, in *Lewis*, we held "that the trial court did not abuse its discretion in refusing [a] stand-your-ground instruction" because "neither [the defendant's] testimony nor [anything else in] the record point[ed] to an opportunity when [the defendant] could have retreated." *Lewis*, 374 So. 3d at 546 (¶58) (citing *Shaheed*).

¶45.    The present case is distinguishable. Haynes did testify that *after Watts struck him and appeared to be reaching for a weapon*—"at [that] moment" or "that point"—he had no other option and no time or opportunity to do anything but draw his gun and shoot Watts in self-defense. Haynes testified that those final and ultimately fatal events happened in the "[b]link of an eye." But Haynes also acknowledged that there was a period of time when he could

23

have walked away from the confrontation before the shooting occurred. Indeed, Haynes acknowledged that another participant, Reed, simply walked away from the confrontation. Reed also testified that he walked away because he felt the situation had become unsafe. When cross-examining Haynes, the State emphasized this opportunity to retreat, repeatedly suggesting that Haynes could and should have walked away like Reed—and that Reed showed "better judgment" than Haynes because he walked away. This opportunity to retreat, emphasized during Haynes's cross-examination, serves to distinguish this case from *Shaheed* and *Lewis*. Because there was a factual basis for a stand-your-ground instruction, the trial court abused its discretion by refusing Haynes's proposed instruction.

## II. Sufficiency of the Evidence

¶46. Haynes also argues there is insufficient evidence to support his manslaughter conviction. "When this Court reviews the sufficiency of evidence supporting a guilty verdict, we view the evidence in the light most favorable to the State and decide if rational jurors could have found the State proved each element of the crime." *Lenoir v. State*, 222 So. 3d 273, 279 (¶25) (Miss. 2017). "We are not required to decide—*and in fact we must refrain from deciding*—whether *we think* the State proved the elements. Rather, we must decide whether a reasonable juror could rationally say that the State did." *Id.* (quoting *Poole v. State*, 46 So. 3d 290, 293-94 (¶20) (Miss. 2010)).

¶47. The jury in this case found Haynes guilty of imperfect self-defense manslaughter. "Unlike true self-defense, imperfect self-defense is not a defense to a criminal act." *Ronk v. State*, 172 So. 3d 1112, 1126 (¶22) (Miss. 2015). "Rather, under the theory of imperfect

24

self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Id.* (quotation marks omitted). "In other words, a defendant is guilty of imperfect self-defense manslaughter if he kills the victim based on a subjective, but objectively unreasonable, belief that the killing is necessary to prevent death or great bodily harm." *Slaughter v. State*, 305 So. 3d 424, 431 (¶24) (Miss. Ct. App. 2020) (citing *Nelson v. State*, 284 So. 3d 711, 716 (¶19) (Miss. 2019)).

¶48. Haynes argues that no reasonable jury could have convicted him of any crime based on the evidence presented. Specifically, Haynes argues that the State failed to prove that his belief that Watts was drawing a weapon was "*unfounded*," as required to support a conviction for imperfect self-defense manslaughter. *Ronk*, 172 So. 3d at 1126 (¶22) (emphasis added). Rather, Haynes argues, all the evidence shows that his belief was objectively reasonable. As part of this argument, Haynes argues that Maddox's testimony that Watts did not assault or threaten Haynes in any way "was simply not credible."

¶49. In *Gunn v. State*, 374 So. 3d 1206 (Miss. 2023), our Supreme Court stated that the defendant's argument "that the State failed to . . . overcome [his] theory of the case[] that he acted in self-defense" was "erroneously present[ed] . . . as a sufficiency of the evidence argument." *Id.* at 1211 (¶20). The Supreme Court explained it had previously "held that the issue of justifiable self-defense presents a question *of weight and credibility of the evidence* rather than sufficiency *and is to be decided by the jury*." *Id.* at 1211-12 (¶20) (second emphasis added) (brackets and quotation marks omitted). "This is because the jury is the sole

25

judge of the credibility of witnesses and the weight and worth of their testimony." *Lenoir*, 222 So. 3d at 279 (¶29) (quotation marks omitted). "We are mindful that the jury has the responsibility to resolve conflicts in the evidence and assess witness credibility, and it may accept in part or reject in part any witness's testimony." *Hartfield v. State*, 161 So. 3d 125, 140 (¶23) (Miss. 2015).

¶50. Here, Maddox testified that he witnessed the shooting and the events preceding it and that Watts did not assault or threaten Haynes in any way. On appeal, Haynes argues that Maddox was not a credible witness because Maddox also testified that he never saw Watts carrying a liquor bottle and that Watts, Lizana, and Paige were only engaged in a "normal conversation" and were not arguing prior to the shooting. Haynes notes that other witnesses testified that Watts had been carrying a liquor bottle and that there was a heated argument before the shooting. But these are simply challenges to Maddox's credibility, which were explored on cross-examination and in closing argument. The jury was the judge of Maddox's credibility and was entitled to weigh and resolve conflicts in the evidence in reaching its verdict. Moreover, although others witnessed an argument, no witness other than Haynes testified that Watts assaulted Haynes or appeared to be reaching for a weapon prior to the shooting. Based on the evidence presented at trial, a rational juror could have found Haynes guilty of manslaughter beyond a reasonable doubt. Therefore, Haynes's challenge to the legal sufficiency of the evidence fails.

**CONCLUSION**

¶51. The trial court abused its discretion by denying Haynes's proposed jury instruction

26

under section 97-3-15(4). However, the State presented sufficient evidence to support Haynes's manslaughter conviction. Therefore, we reverse the judgment of conviction and remand the case for a new trial.

¶52. **REVERSED AND REMANDED.**

**BARNES, C.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND ST. PÉ, JJ., CONCUR. CARLTON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**